***********
Upon review of all of the competent evidence of record with references to the errors assigned and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, the Full Commission AFFIRMS the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of the parties.
3. Defendant-employer employed three or more employees on 23 October 1992.
4. On 23 October 1992, an employment relationship existed between plaintiff and defendant-employer.
5. Continental Casualty Company was the carrier on the risk for workers' compensation purposes on 23 October 1992.
6. Plaintiff's average weekly wage as of 23 October 1992 was $413.48. This yields an applicable compensation rate of $275.67.
7. Plaintiff went on a medical leave of absence on 23 October 1992.
8. In addition to the deposition transcripts and any exhibits attached thereto, the parties stipulated into evidence in this matter stipulated exhibit one, a metric conversion chart. Plaintiff introduced and the undersigned admitted into evidence plaintiff's exhibits marked and numbered 1-75. Defendants introduced and the undersigned admitted into evidence defendants' exhibits one through four.
9. The issues to be determined as a result of the hearing are: whether plaintiff's job with defendant-employer placed him at an increased risk of developing repetitive motion injury or disease to his upper extremities; whether the physical requirements of plaintiff's job significantly contributed to his development of bilateral elbow arthroses; whether plaintiff is permanently totally disabled as a result of alleged occupational disease(s) or whether he has retained any disability as defined in the North Carolina Workers' Compensation Act; and whether plaintiff's claim is barred for not being timely filed and/or does the doctrine of laches or some other time bar defense apply.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. On the date of the hearing in the matter, plaintiff, who is left hand dominant, was 45 years old. Plaintiff has a high school diploma and no other formalized education. Plaintiff has not worked in any capacity for any employer since going out of work on a medical leave of absence on 23 October 1992.
2. Plaintiff was hired by defendant-employer, or its predecessor, in 1975 as a general helper. Plaintiff also worked as a maintenance helper, a machine operator, and a tooling assembler. Plaintiff worked for defendant-employer until going out of work on the medical leave of absence due to pain and loss of range of motion in his elbows which rendered him incapable of working.
3. Plaintiff's job as a machine operator for defendant-employer, a position he held for greater than 13 years, required that he use his upper extremities frequently and repetitively and with load-bearing force. As a machine operator, plaintiff prepared raw product, finished the product, and cleaned and adjusted the machines. The machine operator job required lifting, transporting, handling, and reaching, and load-bearing movements to remove flashing. The job was repetitive and moderately forceful.
4. In May 1989 plaintiff began developing problems with his left elbow while working. Shortly thereafter, plaintiff's right elbow also began to develop problems while working. However, plaintiff continued to work and did not present for medical treatment until 26 January 1990 when he was examined by Dr. E.O. Marsigli, an orthopaedist. Plaintiff reported that he had been unable to fully extend his upper left extremity since May 1989.
5. On or about 23 December 1991 Dr. A.H. Marsigli diagnosed post traumatic arthritis of the left elbow. X-rays and an MRI done upon Dr. E.O. Marsigli's referral in February 1992 confirmed degenerative changes of both elbows in the form of erosive arthropathies. By letter dated 19 February 1996, Dr. E.O. Marsigli stated that he could not determine a cause for plaintiff's bilateral elbow condition, and that "job-related traumatic arthrosis of the elbow has not been described in the literature" to his knowledge.
6. Plaintiff saw Dr. Christopher M. Barsanti, another orthopaedist, for a second opinion. Dr. Barsanti referred plaintiff to Dr. Helen E. Harmon, a rheumatologist, for evaluation. On 8 July 1992 Dr. Harmon diagnosed questionable rheumatoid arthritis. Laboratory results were mixed, and Dr. Harmon did not prescribe anti-rheumatic medications as plaintiff was not currently experiencing inflammation. Dr. Harmon was unable to comment on whether plaintiff's work situation caused or exacerbated his bilateral elbow symptoms, and Dr. Barsanti deferred any such opinions to plaintiff's treating physician(s).
7. Plaintiff came under the care of Dr. Ralph W. Coonrad, an orthopaedic surgeon, in October 1992. Due to the severity of plaintiff's left elbow symptoms, Dr. Coonrad performed a total left elbow replacement on or about 23 November 1992. The diagnosis confirmed by Dr. Coonrad post-surgery was arthrosis of both elbows due to rheumatoid arthritis.
8. Plaintiff was seen in another second opinion by rheumatologist Dr. William Byrd on 3 August 1993. Dr. Byrd diagnosed severe bilateral synovitis and pain of plaintiff's elbows with uncertain etiology; however, he could not exclude rheumatoid arthritis as an underlying diagnosis.
9. Dr. Coonrad performed a total right elbow replacement on 28 September 1993. Plaintiff then saw Dr. David S. Caldwell, a rheumatologist, on 21 December 1993. As a result of this examination, Dr. Caldwell noted that plaintiff may have an atypical presentation of rheumatoid arthritis. While Dr. Caldwell indicated at the time that plaintiff's job may have had something to do with plaintiff's bilateral elbow problems, he indicated he would defer to Dr. Coonrad's judgment with respect to whether repetition played a role in plaintiff's symptomatology.
10. Dr. Coonrad was not deposed in this case. However, the medical notes make reference to his expertise in elbow problems, and also the fact that Dr. Coonrad had never seen a patient develop the type of elbow problems from which plaintiff suffered due to repetitive use. On 3 May 1996 Dr. Coonrad made a record of having had a conversation with plaintiff and counsel in which he discussed, essentially, that it was unlikely that plaintiff's job caused his rapidly progressive and severe arthrosis of each elbow, and that while it may be possible that the job aggravated his condition (if there were other workers who also had the same sorts of problems), no percentage or degree of aggravation could be determined.
11. Plaintiff's diagnosis of rheumatoid arthritis was a difficult one to make due to its atypical presentation. Plaintiff's symptomatology initially affected only his elbow joints to the exclusion of other joints, which is unusual. However, the fact that both elbow joints were affected as opposed to only or primarily the dominant arm was suggestive of the disease of rheumatoid arthritis.
12. Plaintiff's diagnosis of atypical presentation of rheumatoid arthritis was finally definitively confirmed by Dr. Caldwell in January 2001 when x-rays revealed that plaintiff was experiencing erosive changes in his feet. However, based upon the totality of the medical evidence, plaintiff has had rheumatoid arthritis since at least May 1989 when he first began having symptoms in his left elbow and shortly thereafter when his right elbow was affected. Plaintiff currently treats with Dr. Ralph Liebelt once a year in follow-up for his condition.
13. Based upon a totality of the medical evidence presented and upon consensus of the medical opinions, plaintiff's job with defendant-employer did not cause or lead to the development of the rheumatoid arthritis that led to the destruction of his elbow joints for which elbow replacements were necessary.
14. Dr. Caldwell, who initially deferred to Dr. Coonrad's judgment, testified in his deposition that plaintiff's job with its repetitive motion placed plaintiff at an increased risk as compared to members of the general public not so employed of the exacerbation of his underlying rheumatoid arthritis. Dr. Caldwell further testified that plaintiff's job contributed to the advanced arthritis and the resulting destruction of his bilateral elbow joints, and that this aggravation, in conjunction with the underlying disease process, resulted in plaintiff's incapacity for continued work after 22 October 1992.
15. Dr. George S. Edwards, Jr., an orthopaedic surgeon with a specialty in upper extremities, has not treated plaintiff but has reviewed plaintiff's medical history and notes and was deposed in the matter. Dr. Edwards testified that while plaintiff's job subjected his elbows to microtrauma due to its repetitive nature, and that the job could have placed plaintiff specifically, who notably has rheumatoid arthritis, at an increased risk of injuring his arms as compared to members of the general public. However, Dr. Edwards further testified that the job and plaintiff's performance thereof did not have an effect on the cartilage destruction within plaintiff's elbow joints. Dr. Edwards testified that while plaintiff's job temporarily exacerbated his elbow symptoms, the job did not cause or accelerate any permanent deterioration of his elbow joints, and that just using the elbows strenuously does not increase the erosion in the joint.
16. Dr. Douglas H. Adams, an occupational medicine physician, has not treated plaintiff but has reviewed plaintiff's medical history and notes and was deposed in the matter. Dr. Adams testified that while plaintiff's job required him to use his upper extremities repetitively, he (the physician) knew of no studies showing an association between work and the degree of force on a joint and the development or progression (acceleration) of rheumatoid arthritis and the destruction of joints.
17. The only physician who has expressed an opinion that plaintiff's job aggravated his underlying rheumatoid arthritis has been Dr. Caldwell. Based upon a totality of the evidence presented, including the opinions of the physicians, the undersigned hereby assigns greater weight to the testimony and evidence that plaintiff's job did not place him at an increased risk of aggravation of rheumatoid arthritis, and did not contribute to or aggravate plaintiff's underlying arthritic disease and thereby advance the destruction of his elbow joints. The undersigned hereby finds that while plaintiff's job understandably caused him discomfort, pain, and swelling, his severe rheumatoid arthritis was the sole cause of his eventual bilateral elbow joint destruction and this elbow joint destruction would have occurred whether or not plaintiff had performed his job for defendant-employer.
18. While there is evidence of record to show that other of defendant-employer's employees suffered from hand and arm injuries in the course of their employment, there has been no person other than plaintiff who has ever developed complete bilateral elbow joint destruction while performing an operator job with defendant-employer.
19. Based upon a totality of the medical and other evidence presented, plaintiff's inability to work after 22 October 1992 was not caused or contributed to by his employment with defendant-employer, but instead was due to an underlying, preexisting medical condition unrelated to his employment.
20. After going out of work on 23 October 1992, plaintiff began receiving disability benefits, and now receives social security disability benefits.
21. While plaintiff began having problems with his left elbow while working in May 1989, and with his right elbow shortly thereafter, and he was diagnosed with traumatic arthritis in December 1991, and with rheumatoid arthritis in November 1992, and went out of work the month previous, he did not file a claim with the Industrial Commission (a Form 18) until 12 July 1994. The Form 18 was dated 5 July 1994 and claimed that "repetitive load-bearing movements with upper extremities" caused "traumatic arthritis." Plaintiff's bilateral elbow problems began five years prior to the filing of the Form 18, the traumatic arthritis diagnosis was made 2 ½ years prior to the filing of the Form 18, and the rheumatoid arthritis diagnosis was made 20 months prior to the filing of the Form 18.
22. Despite extensive medical treatment both prior to and subsequent to his filing of the Form 18, and despite being out of work since 23 October 1992, plaintiff did not file a Form 33 in furtherance of his claim until 15 October 2000 (Form 33 dated 2 October 2000), more than six years after the filing of the Form 18 and eight years since plaintiff went out of work.
23. Because plaintiff failed to file a notice of his claim with the Industrial Commission and the employer until July 1994, and failed to request a hearing for another six years thereafter, the defendants were not given an opportunity to seek a medical diagnosis or opinion with respect to medical treatment options prior to plaintiff undergoing bilateral total elbow replacements. Likewise, due to their lack of timely notice, defendants were not able to contemporaneously investigate plaintiff's claim. Accordingly, defendants were prejudiced by plaintiff's failure to timely give notice of his claim.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. By filing his Form 18 almost 21 months after going out of work, 2 ½ years after the traumatic arthritis diagnosis and 20 months after the rheumatoid arthritis diagnosis, plaintiff failed to file a notice to the employer within a timely manner as set forth in N.C. Gen. Stat. § 97-58(b) and N.C. Gen. Stat. § 97-22.
2. Furthermore, plaintiff waited six additional years before filing a Form 33 to request a hearing in the matter. In the interim, plaintiff continued to receive medical treatment and was out of work. Plaintiff's failure to prosecute his claim in a timely manner prejudiced defendants because defendants were not given an opportunity to seek a medical diagnosis or opinion with respect to medical treatment options prior to plaintiff undergoing bilateral total elbow replacements. Likewise, due to their lack of timely notice, defendants were not able to contemporaneously investigate plaintiff's claim.
3. Even if plaintiff's notice and request for hearing were timely filed or if the delay in filing both the Forms 18 and 33 were excusable, plaintiff has failed to prove by the greater weight of the evidence that he contracted a compensable occupational disease or that his job with defendant-employer materially aggravated his underlying, preexisting rheumatoid arthritis. N.C. Gen. Stat. § 97-53(13).
4. For the reasons set forth herein, plaintiff's incapacity to earn wages after 22 October 1992 was due to medical reasons unrelated to his employment. N.C. Gen. Stat. § 97-2(9).
5. Based upon the foregoing, plaintiff has failed to meet his burden of proving that he is entitled to benefits under the North Carolina Workers' Compensation Act. N.C. Gen. Stat. §§ 97-1, et seq.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Under the law, plaintiff's claim for workers' compensation benefits must be, and the same is HEREBY DENIED.
2. Each party shall bear its own costs of this proceeding.
This the 31st day of October 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
DISSENTING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
LKM/mb